IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JAMES F. TRAMBLY,

               Plaintiff,

vs.

THE BOARD OF REGENTS OF THE
UNIVERSITY OF NEBRASKA,

               Defendant.

4:20-CV-3094

MEMORANDUM AND ORDER

The plaintiff, James Trambly, claims the defendant, the University of Nebraska Board of Regents, discriminated against him on the basis of a disability and retaliated against him for requesting accommodations in violation of the Americans with Disabilities Act of 1990 (ADA), as amended, 42 U.S.C. § 12101 *et seq*., and the Nebraska Fair Employment Practices Act (NFEPA), Neb. Rev. Stat. § 48-1101 *et seq*. Filing 27.

Specifically, Trambly alleges that, because of a disability, he was demoted, terminated, and subjected to a hostile work environment. Filing 27 at 4. And he asserts that the defendant failed to accommodate his disability, and retaliated against him for requesting accommodations by demoting him, terminating him, and subjecting him to a hostile work environment. Filing 27 at 6-7. The defendant has moved for summary judgment (filing 70), arguing that Trambly cannot prove any of his claims.

## I. STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to

judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact.[1] *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis Cty.*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

---

[1] In conjunction with its reply brief, the defendant provided a "Supplemental Statement of Undisputed Facts," filing 108, which is not a type of filing permitted by the local rules, NECivR 56.1(a) and (c), and Trambly had no opportunity to dispute the facts therein. The Court has not considered these supplemental facts.

## II. BACKGROUND

Trambly was hired by the University of Nebraska-Kearney (UNK) in November 2013 to work in its IT department. He started as a Help Desk Associate, he was promoted to a Workstation Support Specialist in July 2017, and he was terminated on February 8, 2019. Filing 71 at 10, 12, 24; filing 73-32.

### 1. TRAMBLY'S CAREER

Trambly's job duties generally included facilitating requests at the Help Desk in the Otto Olsen building, supporting assigned academic departments, and utilizing student workers. *See* filing 71 at 13, 14. It was part of Trambly's job to be able to work with others and communicate effectively, and he was not to misuse UNK property. Filing 71 at 11. Beginning in 2014, Trambly was assigned to provide support to the Bruner Hall of Science. *See* filing 98-1 at 5.

Throughout his career, Heidi Haussermann was Trambly's direct supervisor, and he also reported to Deb Schroeder for matters related to "standards and security." *See* filing 99 at 3; filing 73-5 at 1. Jane Petersen was at the next level of management. *E.g.,* filing 72-4. Trambly also interacted with the supervisors of various UNK academic departments. *See* filing 99 at 3.

UNK conducts yearly employee performance evaluations for the period of time between April 1 through March 31. *See* filing 71 at 12. In 2014, 2015, 2016, and 2017, Trambly's work for the previous year warranted an overall rating of "Outstanding," the highest possible rating, by Haussermann and Petersen. Filing 72-4; filing 72-5; filing 72-6; filing 72-7. He earned a promotion to a "managerial/professional Workstation Support Specialist" and a pay raise in July 2017, a few months after the 2017 performance evaluation. *See* filing 71 at 12; filing 73-4 at 1.

3

In his new role, Trambly's responsibilities included continuing his work at the Help Desk and supporting assigned university departments. *See* filing 71 at 12. He alleges that he was already doing this work prior to his promotion, so the new job title did not come with any additional responsibilities. Filing 99 at 3. He had to spend approximately half of his week in Otto Olsen at the Help Desk, and the other half supporting the Bruner Hall departments to which he was already assigned. Filing 71 at 12; filing 98-1 at 7. In April 2017, Trambly told Haussermann he needed more time to work in Bruner Hall to complete his assignments. *See* filing 98-1 at 7.

Nathan Moore, another Workstation Support Specialist, worked with Trambly, though he was assigned to different departments. *See* filing 71 at 13; filing 99 at 4. Both Moore and Trambly worked with student workers, *see* filing 71 at 13, though Trambly alleges that Moore was assigned more student support hours than Trambly, filing 99 at 4. According to Trambly, Haussermann assigned more student worker support to Moore because Moore was behind on some of his assigned tasks. Filing 98-1 at 9.

Trambly met with Petersen in August 2017 to discuss student support hours and adjusting his work duties. *See* filing 73-1. Trambly also reported to Petersen that he was having some interpersonal issues with Haussermann. *See id.* The parties dispute the exact timing but, eventually, Haussermann realigned Trambly's responsibilities so he could more effectively support the departments in Bruner Hall. Filing 99 at 3-4; filing 71 at 13.

In February 2018, the defendant reassigned Trambly to support the UNK Business and Finance department. Filing 71 at 15. Trambly alleges that he often he did not have access to the buildings or devices he needed to perform his work, and he would have to wait for others to give him access, which slowed down his work and efficiency. Filing 99 at 5.

4

## 2. TRAMBLY'S DECLINING WORK PERFORMANCE

In November 2017, Haussermann asked Trambly to provide a third-party vendor with access to the UNK planetarium. *See* filing 71 at 14. Haussermann instructed Trambly not to engage with the vendor other than giving them access. *Id*. However, Trambly spoke with Schroeder about providing support to the hardware in the planetarium while the vendor was there. *See id*; filing 73-5. Schroeder told Trambly to listen to Haussermann, and she told him how to address disagreements with his supervisors in the future. Filing 73-5; filing 71 at 14.

For his 2018 performance evaluation, completed in April 2018 for the period between April 1, 2017, and March 31, 2018, Trambly earned an overall rating of "Needs Improvement," a negative performance evaluation. Filing 71 at 15; filing 72-16. Haussermann specifically noted issues with Trambly's performance, including communication issues; that service calls "that should be a quick fix . . . end up taking a lot longer due to explanations that don't need to be given and facts that don't pertain to the situation;" Trambly getting overwhelmed or frustrated; and Trambly unnecessarily interjecting in other people's work. Filing 72-16.

Trambly commented on the evaluation that no one had spoken to him about the issues affecting his score. *Id*. He also explained that he spent "extra time on calls to try to educate [clients] . . . in an effort to decrease calls in the future." *Id*. Trambly requested that he be provided with more feedback throughout the year, rather than only at his annual evaluation. *Id*.

Trambly had more performance issues following the negative evaluation:

- In July 2018, Haussermann met with Trambly "to discuss his job performance and his interactions with his colleagues." Filing 71 at 16. Haussermann indicated that

5

Trambly needed to "just do [his] job" and stop worrying about "what other staff members in the [Help Desk] are doing." Filing 72-17.

- In August 2018, the mother of a high school student complained to Haussermann about how Trambly treated the student while the student was visiting the UNK campus. Filing 71 at 16-17.

- At some unspecified time, Trambly was asked to repair a time clock in UNK's early childhood development center. Filing 71 at 17. Trambly never resolved the issue, "even after repeated inquiries from the staff," for reasons Trambly claims were outside of his control. *Id.*; filing 99 at 7-8.

- In September 2018, a UNK employee complained to Haussermann about Trambly's work and professionalism because Trambly was taking personal calls and disrupting a shared office space. Filing 71 at 17; filing 72-19.

- In November 2018, Haussermann expressed to Trambly that she was concerned about his interjections into other people's work, his poor communication skills, and his failure to escalate problems or work on a team appropriately. Filing 71 at 18; filing 72-21; filing 99 at 8.

- In December 2018, Trambly overheard a conversation between Haussermann and another employee about

6

decommissioning a software that IT used for work order
tickets. Filing 71 at 18. Trambly was concerned about this
process, and he spoke to individuals outside the chain of
command rather than taking his issue to Haussermann.
Filing 71 at 18. Haussermann sent a letter documenting her
concern with Trambly's job performance, filing 72-22, though
Trambly asserts he never received this letter, filing 99 at 9.
Trambly also alleges that there was nothing wrong with him
speaking to the UNK supervisors that were outside of his
chain of command. Filing 98-1 at 18-19.

In November 2018, Trambly accused one of his coworkers of interfering
with his work and personal email accounts. Filing 71 at 20. Trambly believed
that UNK employees were trying to cover up wrongdoing, and were deleting
message histories and altering emails. *Id.* The accusation was investigated,
though the parties dispute the outcome of the investigation. *See* filing 99 at 12.

Trambly believed the hard drive from his university desktop computer
contained evidence related to his interference allegation. Filing 71 at 23. On
January 30, 2019, Trambly sent an email to several UNK employees stating
that he had "the hard drive that [he] pulled from this desktop." Filing 73-11 at
1. The defendant asserts that removing the hard drive was unauthorized and
contrary to UNK's policy that "[a]ttempting to modify or remove computer
equipment . . . without proper authorization" constitutes "misuse" of
university computers and network systems. *See* filing 71 at 27; filing 71-6.
Trambly asserts that he did not believe he needed prior authorization to make
a copy of the hard drive. Filing 98-1 at 14.

The defendant terminated Trambly's employment on February 8, 2019,
effective 90 days later. Filing 71 at 23-24. The termination provided no

explanation for the termination, other than the defendant was exercising "the Employment at Will rights" in Trambly's employment contract. Filing 73-32.

### 3. TRAMBLY'S DISABILITY AND ACCOMMODATION REQUESTS

Trambly's claims are premised on various alleged disabilities: ADHD, Crohn's disease, immune suppression, and asthma. Trambly first told his employer about certain accommodations he needed for his Crohn's disease and immune suppression in his pre-employment interview. *See* filing 98-1 at 2. He informed Petersen and Haussermann that he wanted to work weekends so that he would have time during the week to attend doctors' appointments and take his medication. Filing 98-1 at 2-3. He said he would need time off to accommodate periodic illnesses, and he would need specific time off every few weeks due to one of his medications with unpleasant side effects. Filing 98-1 at 3. Trambly was able to take the necessary time off, and was allowed to work his preferred schedule. But in early 2014, according to Trambly, Haussermann would roll her eyes and "cause problems" with his work environment when he took time off. *Id.*

Trambly told Haussermann he had ADHD in January 2014. Filing 98-1 at 4. In 2014, Trambly also requested that Haussermann "ensure that [he] not be interrupted by other employees while performing tasks." Filing 98-1 at 4. And, he requested that he not be put "in situations that would be negatively affected by [his] ADHD," such as speaking in front of a group of people. *Id.*

After learning Trambly had ADHD, Haussermann and Petersen allegedly made negative and disparaging comments about him between January and June of 2014. Filing 98-1 at 4. Trambly asked that they stop making those comments. *See* filing 98-1 at 4. Sometimes, Trambly "would become confusing when speaking," and he asked that Haussermann and Petersen stop "complaining" when that would happen. *Id.* Some of these 2014

comments were made in front of coworkers, and Trambly alleges Haussermann and Petersen would badmouth him to his coworkers. *Id.* Sometime in 2014, Trambly tried to request an accommodation from Petersen, but she told him to "never bring this up to her again." Filing 98-1 at 5.

In April 2017, Trambly asserts that Haussermann knew that Trambly "worked more slowly on some tasks" because of his ADHD, but Haussermann assigned work to Trambly that was initially assigned to Moore and another coworker. *See* filing 98-1 at 7. Trambly asked for more support from student workers to help accommodate him. *Id.* Haussermann continued to give Trambly other coworkers' work until August 2017. *Id.* Sometime in 2017, Trambly had sinus surgery, and in December 2017, Petersen and Haussermann "made negative comments" and complained about how much time Trambly had taken off work. Filing 98-1 at 16.

Trambly visited with the UNK Ombudsperson and Compliance Manager, Deborah Huryta, on March 21, 2018. They discussed possible disability accommodations and unspecified interpersonal issues that Trambly was having with Petersen and Haussermann. *See* filing 71 at 24. Trambly's suggested accommodations included "a quiet place to work; directions to other co-workers that he not be interrupted; that his supervisors be understanding and not make hostile or critical comments about his disability; and that his supervisors not criticize him if he spoke off topic." Filing 99 at 18.

Huryta emailed Trambly with forms to fill out to begin the interactive accommodation process on March 21, 2018—Trambly alleges the email disappeared from his inbox. *See* filing 71 at 2; filing 99 at 14; filing 71-2 at 14. Trambly alleges he asked for the forms to be sent again, but the defendant never provided them. Filing 99 at 14-15.

In October 2018, Trambly reached out to a different UNK employee about how to report a disability and request an accommodation. Filing 71 at 24. The employee told Trambly to contact Jill Flagel. Filing 71 at 25. Trambly also reached out to some other employee, whose position was not specified, about how to obtain accommodations. Filing 99 at 17. Trambly alleges he persistently attempted to contact the appropriate supervisors and return the appropriate forms, but he was ignored. *See* filing 99 at 15-16; filing 98-1 at 17.

Eventually, sometime in November 2018, Trambly mailed the completed forms to formally request an accommodation for his ADHD. Filing 99 at 17; filing 71 at 25. Approximately two weeks later, on December 13, 2018, Flagel contacted Trambly's medical providers for documentation about his disability. Filing 71 at 26. She was unable to obtain Trambly's medical records prior to his termination, though Trambly offered to provide his own copies of those records. Filing 71 at 26; filing 99 at 17.

(a) Private Work Space

In January 2014, Trambly told Haussermann that working in the "back office" was "helpful to accommodate his ADHD" because it minimized distractions. Filing 98-1 at 4; filing 99 at 7. Trambly worked in the "back office" until some unspecified point in 2016, when Haussermann moved him to the front area of the Help Desk. *See* filing 99 at 29; filing 98-1 at 6. According to Trambly, Haussermann "needed someone to be up in front to assist students at all times," and Trambly was assigned that role. Filing 98-1 at 7.

Between April 2017 and December 2017, Trambly shared an office with Moore in Copeland Hall. Filing 98-1 at 8. While Trambly was told by an unnamed person that he could store his equipment or hardware there, "Moore occupied most of that space, utilized much of the best hardware that [Trambly] was able to save there for [Moore's] own purposes, or even threw away some of

[Trambly's] items." Filing 98-1 at 8. Moore often came into the office while Trambly was using it, and Moore and others distracted Trambly from his work. *Id.*

When Trambly was reassigned from Bruner Hall to the business and finance department, Haussermann requested that Trambly have storage and workspace in that department. *See* filing 71 at 15. Despite Haussermann's requests, no workspace was available. Filing 71 at 15; filing 99 at 5. Trambly alleges that there was a vacant office, but he was not allowed to use it. Filing 98-1 at 10. He "was not designated to work in any single location but worked in different locations as necessary." Filing 98-1 at 10.

Eventually, around or before November 2018, Trambly was provided with shared office space in Otto Olsen. Filing 99 at 6; filing 71 at 13; filing 98-1 at 11. He could not keep equipment or hardware in the office, and he could not "reconfigure other hardware that was already there," which made his "work more complicated and stressful." Filing 98-1 at 11.

### (b) Bruner Hall

Trambly alleges that he was concerned about working in Bruner Hall because of his immune suppression. *See* filing 99 at 35. Bruner Hall allegedly housed an infectious disease class and other science labs and courses related to mold, so Trambly was worried about getting sick. *See* filing 71-2 at 8, 13; filing 98-1 at 16. Trambly alleges that in 2014, 2017, and 2018, he asked to be moved out of Bruner Hall because he was afraid of getting an infection. Filing 98-1 at 5, 16. He does not allege that his health was ever impacted by working in Bruner Hall.

In December 2017, Trambly spoke with Karen Berryman (who is, presumably, a UNK employee, though it's not clear who she is or what position she holds) about accommodations for his immune suppression. *See* filing 99 at

15. In January 2018, Trambly told Berryman he did not want to work in Bruner Hall because of his immune suppression; he was reassigned from Bruner Hall to the business and finance department a week later "as an accommodation for [his] immune suppression." Filing 98-1 at 9, 16.

## III. DISCUSSION

Trambly has asserted several theories of recovery for alleged disability discrimination under the ADA and NFEPA. Specifically, Trambly alleges:

- The Regents terminated him because of at least one of his disabilities;
- The Regents gave him a negative performance evaluation in 2018 because of his disabilities;
- The Regents adversely modified his job duties and workspace because of his disabilities;
- The Regents subjected him to a hostile work environment on the basis of his disabilities;
- The Regents failed to accommodate his disabilities; and
- The Regents retaliated against him for requesting accommodations.

*See generally* filing 99.

The ADA prohibits covered employers from discriminating against "a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The ADA also prohibits employers from retaliating against employees for engaging in a statutorily protected activity, which includes requesting an accommodation. 42 U.S.C. § 12203(a); *Anderson v. KAR Global*, 78 F.4th 1031, 1036 (8th Cir. 2023). When there is no direct evidence of discrimination or retaliation, a plaintiff may establish an inference of discrimination or retaliation under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,*

411 U.S. 792 (1973). *Anderson,* 78 F.4th at 1036. If the plaintiff can establish a prima facie case, the burden of production shifts to the employer to show a "legitimate, nondiscriminatory reason for the adverse action." *Id.* The burden then shifts back to the plaintiff "to show that the proffered reason was, in reality, a pretext for discrimination." *Id.* at 1037.

### 1. DISABILITY DISCRIMINATION

To show a prima facie case of his disparate treatment claims, Trambly must establish that he is disabled under the ADA, he is qualified to perform the essential functions of the job with or without an accommodation, and he suffered an adverse employment action because of his disability. *Anderson,* 78 F.4th at 1036.

### (a) Qualified Person with a Disability

The parties do not appear to dispute that Trambly was qualified to do his job. But the defendant argues that Trambly cannot show that he is disabled or was regarded as disabled for the purposes of the ADA and NFEPA. To prove he has a disability, Trambly has the burden to show that he has a physical, sensory, or mental impairment that materially limits one or more major life activities, that he has a record of such an impairment, or that he is regarded as having such an impairment. 42 U.S.C. § 12102(1); *Duello v. Buchanan Cnty. Bd. of Sup'rs,* 628 F.3d 968, 972 (8th Cir. 2010); *Dovenmuehler v. St. Cloud Hosp.,* 509 F.3d 435, 439 (8th Cir. 2007).

Trambly alleges that he has various disabilities: ADHD, Crohn's disease, "immune suppression," and asthma. *See* filing 99 at 14. Trambly alleges his ADHD substantially limits at least one major life activity because he can only focus "for approximately an hour to an hour and a half at any one point in time on any one subject," and he has difficulty concentrating. Filing 99 at 23; filing

13

71-2 at 1. And his immune suppression does not cause him to get sick more often, but when he is sick, it takes him longer to recover. *See* filing 98-1 at 3. Trambly has not provided any evidence or argument as to how his asthma[2] or Crohn's disease[3] limit any major life activity. *See* filing 99 at 24-25; filing 98-1 at 2-3, 6. Trambly has not met his burden on summary judgment that he is disabled within the meaning of the ADA as a result of his Crohn's disease or asthma. *See Dovenmuehler*, 509 F.3d at 439.

The Court will assume without deciding (a *generous* assumption)[4] that Trambly has presented sufficient evidence (for the purposes of the analysis of the summary judgment motion) that he is disabled based on his diagnoses of ADHD and "immune suppression." Thus, in the interests of a fully developed analysis, the Court will proceed to determining whether he suffered an adverse employment action, and whether there is evidence that the defendant took such an action on the basis of Trambly's disabilities.

---

[2] Trambly asserts in his declaration that he "was not able to have a normal life" because of his asthma. Filing 98-1 at 6. He does not connect his asthma to any specific major life activities, and his conclusory statement is insufficient to meet his burden at the summary judgment stage. *See Dovenmuehler*, 509 F.3d at 439; *Keiran v. Home Capital, Inc.*, 858 F.3d 1127, 1132 (8th Cir. 2017) (citing *Chavero-Linares v. Smith*, 782 F.3d 1038, 1041 (8th Cir. 2015)).

[3] Trambly specifically alleges that his Crohn's disease would not affect his job performance and did not impact any major life activities. Filing 98-1 at 18. While he "would have to go to the bathroom more often," and might need to take time off, he had not had a bad flare-up related to his Crohn's disease since 2001. *Id.*

[4] Trambly's evidence of his ADHD is a diagnosis from 1996. *See* filing 98-1 at 2, 21. He was not being treated for ADHD during his employment with the defendant. *See* filing 99 at 23. And the record is devoid of any actual diagnosis of "immune suppression." *See generally* filing 98-1.

14

(b) Hostile Work Environment

To survive a motion for summary judgment on a hostile work environment cause of action, an employee must provide sufficient evidence to support the allegation that he was subject to unwelcome harassment that affected a term, condition, or privilege of employment. *E.g., Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 634 (8th Cir. 2016). Courts look to the "totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct was physically threatening or humiliating, as opposed to a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." *Alvarez v. Des Moines Bolt Supply, Inc.,* 626 F.3d 410, 420 (8th Cir. 2010); *Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911, 921-22 (8th Cir. 2018).

"Conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law." *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 721 (8th Cir. 2003). The ADA does not protect employees from the sporadic use of abusive language, nor do civil rights laws immunize employees from "petty slights or minor annoyances" common in the workplace. *See Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789, 799 (8th Cir. 2021); *cf. Aubuchon v. Geithner*, 743 F.3d 638, 644 (8th Cir. 2014) (citing *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

Trambly has identified a handful of isolated incidents over the course of five years where he felt disrespected by his supervisors, none of which satisfy the Eighth Circuit's demanding standard set forth above. *See* filing 99 at 43. The totality of the circumstances demonstrates that the alleged poor treatment Trambly received was infrequent, not severe, and not physically threatening or humiliating. *Alvarez,* 626 F.3d at 420; *see also Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1039 (8th Cir. 2005). Trambly also cannot show that the

alleged comments interfered with his work performance. He obtained a promotion and continued to receive positive performance reviews after the allegedly discriminatory comments.

And Trambly appears to argue that when Haussermann or Petersen criticized his work performance, he would get confused, and such criticism exacerbated his disabilities. *See* filing 99 at 43. But the ADA does not protect employees from criticism by their supervisors—it protects employees from unlawful discrimination. *Compare* filing 98-1 at 4 ("I asked Haussermann and Petersen to stop complaining when I would become confusing when speaking"), *with O'Brien v. Dep't of Agriculture*, 532 F.3d 805, 810 (8th Cir. 2008) ("unfair criticism and being yelled at did not amount to actionable harassment" (citing *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1159 (8th Cir. 1999)). Trambly appears to argue that his supervisors should not be allowed to criticize his job performance because any "interruption" to his work exacerbated his ADHD and made him unable to perform his job effectively. Such an allegation is better framed in his failure-to-accommodate claim, *infra*, but does not support his hostile work environment claim.

The evidence supports that Trambly had an unpleasant interpersonal relationship with Haussermann and Petersen. *See* filing 98-1 at 5; filing 71-3. But there is no evidence that the unpleasantness rose to the level of a hostile work environment.

### (c) Adverse Employment Action Because of a Disability

Trambly alleges a variety of changes in his employment conditions that he says materially disadvantaged him. *See* filing 99 at 33. An employer is liable for tangible and intangible changes in employment conditions which produce a material employment disadvantage due to the employee's disability. *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1060 (8th Cir. 2016); *Clegg v. Ark. Dept.*

16

*of Correction*, 496 F.3d 922, 926, 927 (8th Cir. 2007); *Buboltz v. Residential Advantages, Inc.*, 523 F.3d 864, 868 (8th Cir. 2008), *abrogated on other grounds by Torgerson*, 643 F.3d 1031. Generally, a job change must result in a reduction in salary, benefits, or prestige, or must hamper an employee's future with an employer, to establish an adverse employment action. *See Buboltz*, 523 F.3d at 868-69. But "[m]inor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." *Clegg*, 496 F.3d 927. An employee who is merely unhappy with employment changes has not been subjected to an adverse action. *Dickinson State Univ.*, 826 F.3d at 1060 (citing *Buboltz*, 523 F.3d at 868). Inconvenient job changes are also not adverse. *Buboltz*, 523 F.3d at 868.

Specifically, Trambly asserts that his working conditions were modified at various points in his career. The allegations are hard to parse. *See* filing 99 at 34. From what this Court can tell, he alleges that in June 2014 and December 2017, Haussermann and Petersen made "hostile and embarrassing comments and conduct" towards him. Sometime in 2014, Trambly was discouraged from communicating with his superiors about his ADHD. In 2016, Trambly lost access to a back office he allegedly needed to avoid distractions because of his ADHD, and he says that throughout his employment he did not have sufficient access to office or storage space. From April 2017 until January 2018, Trambly had to work at the Help Desk more than his coworkers. In April 2017, Trambly was assigned extra work that should have been done by his coworkers. And, in 2017 and 2018, Trambly was provided fewer student support hours than his coworkers. *See* filing 99 at 34; *see generally* filing 98-1.

Trambly's argument *appears* to be that the combination of the above working conditions made it more difficult for Trambly to complete his job in a

17

satisfactory manner. But many of these conditions existed throughout the majority of Trambly's employment, and Trambly received overall positive reviews even in the face of these working conditions. Trambly has not provided sufficient evidence from which a trier of fact could find, or from which this Court can draw a favorable inference, that *any* of the alleged changed working conditions, alone or in combination, put him at a material disadvantage. Rather, his complaints about the distribution of the workload and student support hours, not having office space, and disagreeable conduct from supervisors represent inconveniences common in almost every workplace, and are not materially adverse. *See Clegg,* 496 F.3d 927; *Dickinson State Univ.,* 826 F.3d at 1060; *Buboltz,* 523 F.3d at 868-69.

And Trambly's allegations about his changed job duties lack any causal connection to his disability. His allegations regarding comments by his supervisors collapse into his hostile work environment claim, *supra*, while his allegations about his need for office space collapse into his failure-to-accommodate claim, *infra*. But otherwise, there's no evidence or allegation that his employment conditions were changed because of his disability, in the face of his overall positive performance evaluations and the fact that his employers knew about his alleged disabilities throughout his employment. *See* filing 99 at 23.

In any event, the parties agree that Trambly's termination constitutes an adverse employment action. *See Clegg,* 496 F.3d at 926, 927; filing 71 at 36. And the parties agree that, to some extent, the 2018 negative performance evaluation was also an adverse employment action.[5] The parties also appear

---

[5] The Court is assuming without deciding that the 2018 performance evaluation was an adverse employment action, even though "an unfavorable evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or

to assume that, while he does not have direct evidence of discrimination, Trambly has shown some evidence of causation to satisfy his prima facie case. *See generally* filing 99; filing 71. So, under the *McDonnell Douglas* framework, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reasons for Trambly's termination, and to survive summary judgment, Trambly must provide evidence that the reasons are pretextual. *See Canning v. Creighton Univ.*, 995 F.3d 603, 611 (8th Cir. 2021).

The defendant provided several nondiscriminatory reasons for Trambly's termination: complaints about his job performance, his failure to follow the chain of command, and his violation of university policy. *See* filing 71 at 41; *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 769 (8th Cir. 2008); *Lors v. Dean*, 595 F.3d 831, 834 (8th Cir. 2010). Trambly doesn't assert that the reasons given by the defendant for the negative performance evaluation were pretextual; rather, he argues that the evaluation "was largely the result of a failure to accommodate." Filing 99 at 45. His argument regarding the evaluation is more appropriately discussed in that context, *infra*, because he does not assert that the negative performance evaluation was dishonest.

### (d) Nondiscriminatory Reasons and Pretext

To show that a reason for an adverse action is pretextual, Trambly must produce some evidence that the proffered explanations are "unworthy of credence." *Rollins v. Mo. Dep't of Conservation*, 315 F. Supp. 2d 1011 (W.D. Mo. 2004) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

---

conditions of the recipient's employment." *Clegg*, 496 F.3d at 927 (quoting *Higgins v. Gonzales*, 481 F.3d 578, 586 (8th Cir. 2007), *abrogated on other grounds by Torgerson*, 643 F.3d 1031). There is no evidence regarding whether the defendant actually used that performance review in altering Trambly's employment.

143-44 (2000)). An employer's explanation may be unworthy of credence if an employer "failed to follow its own policies," "treated similarly-situated employees in a disparate manner," or shifted its explanation of the employment decision. *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010); *see also Hustvet v. Allina Health Sys.*, 910 F.3d 399, 412 (8th Cir. 2018) (quoting *EEOC v. Prod. Fabricators, Inc.*, 763 F.3d 963, 971 (8th Cir. 2014)). However, the Court does not get to decide whether the proffered reason "was wise, fair, or even correct." *Canning*, 995 F.3d at 612; *McNary*, 535 F.3d at 769. Rather, Trambly must provide evidence which, if proven, would show that the defendant is being dishonest in its proffered explanations. *See Canning*, 995 F.3d at 612; *McNary*, 535 F.3d at 769-70.

Trambly claims that he has "discredited" the reasons given for his termination. Filing 99 at 45. It's true that Trambly provided various explanations for why he didn't do anything wrong when he spoke to supervisors outside the scope of his command (filing 99 at 5, 31) or removed a hard drive from a university computer (filing 99 at 12). And he claims that the defendant did not tell him he would be disciplined or terminated because of the complaints made against him. Filing 99 at 30. But none of these explanations by Trambly indicate that the defendant is being dishonest in its proffered reasons for his termination, and the Court is not "a super-personnel department that reexamines an entity's business decisions." *See McNary,* 535 F.3d at 770 (quoting *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 812 (8th Cir. 2005)).

Trambly asserts that the defendant did not include any of its purported reasons for firing him in the termination notice, filing 73-32, and so these reasons should not be believed. Filing 99 at 28. But Trambly has not provided any evidence that the defendant is required to give Trambly such justifications,

either by law or by UNK policy or custom. Trambly's termination notice didn't provide *any* reason for firing him. This isn't a case in which the employer changed its story. Trambly does not allege, nor does he have evidence to support, that the defendant changed its justifications for his termination at any point. Trambly has not supported his contention that the defendant's failure to include the reasons for terminating him in the termination notice creates a genuine dispute of material fact on the issue of pretext.

Trambly has not identified a policy that the defendant failed to follow, an employee who was treated differently,[6] or any other indication that the proffered nondiscriminatory reasons are unworthy of credence. *See Prod. Fabricators,* 763 F.3d at 970. For these reasons, Trambly has failed to show any genuine issue of material fact as to whether the defendant's proffered justifications were pretext for an illegal discriminatory motive based on his disability, and the defendant is entitled to summary judgment.

## 2. FAILURE TO ACCOMMODATE

To prevail on his failure-to-accommodate claim under the ADA, Trambly must show he has a disability within the meaning of the ADA, he is a qualified individual under the ADA, and he suffered an adverse employment action due to his disability. *Mobley v. St. Luke's Health Sys., Inc.*, 53 F.4th 452, 456 (8th Cir. 2022). Trambly must put on evidence that the alleged failure to

---

[6] Trambly appears to assert that his coworker, Nathan Moore, was treated better than him. *See* filing 99 at 46. But to show pretext by evidence of disparately treated employees, Trambly must demonstrate that he and the other employee were similarly situated in all relevant respects. *See McNary,* 535 F.3d at 770. Trambly has not presented any such evidence, *see generally* filing 99, and he cannot meet his burden. Trambly also references another coworker, "Lineman," but he does not even identify that coworker's first name or job title. *See* filing 99.

accommodate "negatively impacted [his] medical condition or job performance." *See Lenzen v. Workers Comp. Reins. Ass'n*, 705 F.3d 816, 822 (8th Cir. 2013); *Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 754 (11th Cir. 2023) ("[D]iscrimination in the form of a failure to reasonably accommodate is actionable under the ADA only if that failure negatively impacts the employee's hiring, advancement, discharge, compensation, training, and other terms, conditions, and privileges of his employment." (citing 42 U.S.C. § 12112(a))). And, Trambly must show a requested accommodation is "reasonable on its face, *i.e.*, ordinarily or in the run of cases." *Peebles v. Potter*, 354 F.3d 761, 768 (8th Cir. 2004) (quoting *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002)). The requested accommodation must be related to the employee's disability. *Id.* (an accommodation must "meet an individual's disability-related needs" (quoting *Barnett*, 535 U.S. at 399)).

For his failure-to-accommodate claim to survive summary judgment, Trambly "must also show that his employer failed to engage in the interactive process in good faith." *Mobley*, 53 F.4th at 457. But if he requested an unreasonable accommodation, his employer is not liable for failing to engage in that process. *Peebles*, 354 F.3d at 769.

### (a) Immune Suppression Accommodations

Trambly alleges that because of his immune suppression, he requested that he not be required to work in Bruner Hall. Filing 99 at 35. Trambly alleges that he was reassigned to the business and finance department "as an accommodation for my immune suppression." Filing 98-1 at 9. This move occurred a week after he spoke to Berryman in January 2018 about his concerns working in Bruner Hall. Filing 98-1 at 16.

Trambly has not carried his burden of showing that the defendant's failure to remove him from working in Bruner Hall negatively impacted his

medical condition or his job performance. *Lenzen*, 705 F.3d at 822. First, he only received a negative performance review after he *stopped* working in Bruner Hall. *See* filing 72-16. And Trambly has not identified, through evidence or argument, how working in Bruner Hall exacerbated his immune suppression, only that Trambly feared it might. *E.g.*, filing 98-1 at 9-10. The defendant is entitled to summary judgment on Trambly's claim that the defendant failed to accommodate him by assigning him to work in Bruner Hall.

### (b) ADHD Accommodations

Trambly alleges that he needed several accommodations based on his ADHD. Trambly's argument is, or at least appears to be, that if he had access to a private office space and student support, if he had not been interrupted, and if he had been assigned less work, he would have more efficiently completed service tickets. He also appears to allege that he would not have been terminated but for the defendant's failure to accommodate him.

But prior April 1, 2017, the beginning of the period for his only negative performance evaluation, Trambly had no issues with his job performance. *See* filing 71 at 12. He was promoted. *Id.* And Trambly does not allege that his ADHD was somehow made worse by the defendant's failures to provide him with a private office or by the defendant's criticisms and interruptions, nor is it possible to draw such an inference from the evidence provided. Trambly has not carried his burden that the defendant's failure to accommodate his ADHD prior to April 1, 2017, "negatively impacted [his] medical condition or job performance." *See Lenzen*, 705 F.3d at 822.

The Court will address the defendant's alleged failures to accommodate Trambly's ADHD beginning only after April 1, 2017. Trambly argues that he received a negative employment evaluation because the defendant failed to accommodate his disabilities, which might support an inference that he was

unable to adequately perform some of the essential functions of his job without an accommodation. *See* filing 99 at 45; *Dickinson State Univ.*, 826 F.3d at 1060 (quoting *Hatchett v. Philander Smith Coll.*, 251 F.3d 670, 675 (8th Cir. 2011)); 29 C.F.R. § 1630.2(o)(1)(ii). A featured criticism on the evaluation was that Trambly took too long to respond to service tickets, so, presumably, completing work tickets in an efficient manner is an essential function of the Workstation Support Specialist position. *See* filing 72-16. Trambly's proposed accommodations were not being criticized or interrupted by his supervisors, being assigned more student support hours, adjusting his workload, and being provided a private office. Filing 99 at 36, 37, 19.

### (i) Criticism and Interference

Trambly has not identified any specific incidences when his supervisors interrupted or criticized him on or after the relevant date. *See* filing 98-1 at 4. Nor would such an accommodation be reasonable. *See Cannice v. Norwest Bank Iowa N.A.*, 189 F.3d 723, 728 (8th Cir. 1999) ("We do not believe . . . that the obligation to make reasonable accommodation[s] extends to providing an aggravation-free environment."); *Schwarzkopf v. Brunswick Corp.*, 833 F. Supp. 2d 1106, 1122-23 (D. Minn. 2011) (employee's request for an accommodation that supervisors and others "not yell at him" was not reasonable) (collecting cases). Trambly's proposed accommodation to be free from criticism or interference by his supervisors or coworkers is not reasonable on its face, nor has Trambly provided any caselaw or argument to the contrary. *See Peebles*, 354 F.3d at 768.

### (ii) Student Support Hours and Workload Adjustments

Trambly's request for more student support hours and less work is also unreasonable as a matter of law. According to Trambly, Haussermann

24

allocated more student support hours to Moore because Moore was behind on his work. Filing 98-1 at 9. An employer "is not required to reassign existing workers to assist [the employee] in his essential duties." *Knutson v. Schwan's Home Serv., Inc.*, 711 F.3d 911, 916 (8th Cir. 2013) (quoting *Dropinski v. Douglas Cnty, Neb.*, 298 F.3d 704, 709 (8th Cir. 2002)) (alteration in original). An employer is permitted to distribute work as needed, and Trambly does not allege that being assigned additional work was related in any way to his disability. *See Peebles*, 354 F.3d at 769. These proposed accommodations are facially unreasonable.

### (iii) Private Office

To the extent Trambly asserts that he was not afforded any storage space, such an accommodation is not related to his disability. *See Peebles*, 354 F.3d at 769. Trambly has made clear his need for a private office as it relates to his ADHD is his need to be free from distractions so that he can effectively do his job. His ADHD was irrelevant when he needed to traverse across the UNK campus with his equipment. *See id.*

While the defendant assigned Trambly some space, Trambly alleged that the accommodations were insufficient. Trambly alleges that the Copeland Hall office was insufficient because he had to share the office with Moore, who frequently interrupted him. Filing 98-1 at 8-9. Trambly makes this same complaint about the office in Otto Olsen that he was provided in November 2018: he had to share the space with others, and was interrupted by Petersen and other coworkers. Filing 98-1 at 11. He alleges that he complained about these working conditions to Huryta in March 2018. *See* filing 99 at 18.

A request for a private office is not unreasonable as a matter of law. *See Lenzen*, 705 F.3d at 821. Trambly has provided at least some evidence that he requested a better accommodation than the shared office space, and the

defendant did not accommodate him. *See id.* However, Trambly has still not met his burden of showing that being denied an office negatively impacted his job performance or medical condition.

The employment evaluation specifically identified the areas where Trambly's performance suffered. Trambly needed to "Reduce excessive time spent on completing tickets." Filing 72-16 at 3. But the more specific feedback was that he needed to reduce that time by "delegating work and tasks to students where applicable more frequently," and "sometimes things that should be a quick fix . . . end up taking a lot longer due to explanations that don't need to be given and facts that don't pertain to the situation." *Id.* at 2. The performance evaluation indicated that Trambly worked after hours to finish tickets. There's no indication that Trambly received a negative performance review, was terminated, or was otherwise negatively affected by interruptions from others in a shared workspace. *See* filing 72-16.

The evidence reflects that Trambly's performance began to decline, at the earliest, around April 2017. *See* filing 72-16. The earliest example of poor performance provided by the defendant was not until November 2017, regarding Trambly's judgment in interacting with a third-party vendor. *See* filing 71 at 14. Trambly does not allege that his disability worsened throughout his employment. Trambly was not provided a private office to his satisfaction at any point, yet he continued to receive positive evaluations. It was not until his promotion, the duties of which Trambly alleges he had already been performing (filing 99 at 3), that his performance began to suffer.

Trambly has not provided sufficient evidence to support an inference that his declining performance was caused by the defendant's failure to provide a private office. In fact, he offers his own theories of causation: Haussermann assigned more work to him than his coworkers, he was unable to access the

buildings in which he needed to work, and he could not store his equipment in an office unoccupied by anyone else. But the Court has already explained why Trambly has not sufficiently evidenced a connection between those allegations and his disability. Trambly has no evidence that the failure to provide a private office negatively impacted his job performance or medical condition.

Because Trambly did not request a reasonable accommodation sufficiently tied to his "disability-related needs," *see Barnett*, 535 U.S. at 399, the Court need not address whether the defendant engaged in the interactive process in good faith. *Mobley*, 53 F.4th at 457; *Peebles*, 354 F.3d at 769.

### 3. RETALIATION

To show a prima facie case of retaliation, Trambly must establish that (1) he engaged in statutorily protected activity, (2) an adverse employment action was taken against him, and (3) a causal connection exists between the two events. *Hustvet v. Allina Health Sys.*, 910 F.3d 399 (8th Cir. 2018) (ADA); *Haffke v. Signal 88, LLC*, 306 Neb. 625, 633-34 (2020) (NFEPA). For the reasons explained above, the adverse employment actions at issue are limited to the negative performance evaluation from April 2018, and Trambly's termination in February 2019.

Requesting an accommodation is a protected activity. *Anderson*, 78 F.4th at 1036. Trambly alleges that he made several requests for accommodations over the course of his career with UNK, to several different individuals. *See* filing 99 at 44. And apparently, at some point, something changed, and he began to be retaliated against for the requests he made between 2013 and 2017. *See id*. Trambly received his first negative performance evaluation only one month after he spoke with Huryta about receiving disability accommodations, and his termination came several months after that.

27

Generally, "more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Anderson*, 78 F.4th at 1037 (quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999)). An employee must prove that an impermissible retaliatory motive was the 'but-for cause' of an adverse employment action. *See Donathan v. Oakley Grain*, 861 F.3d 735, 739 (8th Cir. 2017) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)).

Trambly has not shown any evidence, other than a temporal connection, which would show that that the defendant gave him a negative performance evaluation and retaliated against him because of his March 2018 request for accommodations. But even if he did, he cannot show that the defendant's nondiscriminatory reasons for those actions are pretextual.

In *Kiel*, the Eighth Circuit affirmed a grant of summary judgment where the employee requested accommodations on numerous occasions, but suffered no adverse employment action until he engaged in undesirable conduct towards his employer. 169 F.3d at 1136. Like in *Kiel*, Trambly alleges that he made several requests for accommodations between 2014 and 2018, but he was never treated differently until his declining performance beginning in November 2017, when he had an issue with Haussermann and Schroeder. Trambly has not alleged that the defendant disciplined other employees less harshly for comparable behavior, like his increasingly poor performance, complaints from parents, complaints from other supervisors, and failing to communicate effectively. *See id.*; *see generally* filing 99.

There is simply no evidence from which a reasonable jury could find that the defendant gave Trambly a negative performance evaluation and terminated him in retaliation for requesting accommodations. *See Kiel*, 169 F.3d at 1136; *Donathan*, 861 F.3d at 739. Trambly has not presented sufficient

28

evidence to create a material question of fact as to whether his termination was motivated by retaliation rather than the multiple instances of alleged unprofessional conduct. For these reasons, the defendant is entitled to summary judgment.[7]

## IV. CONCLUSION

Trambly's claims for disability discrimination, a hostile work environment, a failure-to-accommodate, and retaliation all must fail, under both federal and state law. *See Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1106 n.2 (8th Cir. 2016). Even drawing every possible inference in his favor, Trambly has not presented any evidence that would allow a finder of fact to find for him on any of his claims. Accordingly,

IT IS ORDERED:

1.  The defendant's motion for summary judgment (filing 70) is granted.

2.  The plaintiff's complaint is dismissed.

3.  A separate judgment will be entered.

---

[7] Because the record on summary judgment establishes that Trambly has no valid retaliation claim against the defendant, the Court need not determine whether Title V of the ADA was a valid abrogation of sovereign immunity. *Lors v. Dean*, 746 F.3d 857, 864 (8th Cir. 2014).

Dated this 27th day of March, 2024.

BY THE COURT:

John M. Gerrard
Senior United States District Judge